# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| Next Jump, |
| *Movant*, |
| v. |
| United States of America |
| *Respondent*. |

Case No.:  1:24-mc-00105-TNM

**REPLY TO GOVERNMENT OPPOSITION TO NEXT JUMP'S MOTION TO QUASH
THE GOVERNMENT'S TRIAL SUBPOENA UNDER RULE 17(C)(2)
<u>RELATED TO *UNITED STATES v. BURKE ET AL.*</u>**

Reed Brodsky (*pro hac vice*)
 *Counsel of Record*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
rbrodsky@gibsondunn.com

*Counsel for Next Jump*

Next Jump respectfully submits this reply in response to the government's September 20, 2024 submission. Despite the government's conclusory statements in its opposition brief, the trial subpoena still does not meet the requirements of relevance, admissibility, and specificity.

## INTRODUCTION

The government's brief in opposition ("Opp.") confirms its intent to conduct a fishing expedition through Next Jump's files for documents that may or may not exist, and that do not meet the relevance, admissibility, and specificity tests. This tactic is prohibited by Federal Rule of Criminal Procedure 17, which provides that subpoenas *duces tecum* may not be used as a way to conduct discovery. Indeed, the government bears the burden of establishing Rule 17's exacting requirements of relevance, admissibility and specificity under *Nixon*. Even if the government's subpoena satisfied the requirements of Rule 17—which it plainly does not—the government can readily obtain a substantial amount of the materials from the U.S. military.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

It is puzzling why the government decided to include a factual and procedural background when it is irrelevant to the question at hand: whether the government followed the *Nixon* standard. However, because the government's statements are inaccurate and incomplete, Next Jump must now correct the record with the actual record evidence pertaining to the government's investigation and Next Jump's cooperation with it.

From the beginning, the government demonstrated a disregard for hearing or receiving any evidence from Next Jump, or meeting and conferring with Next Jump regarding the October 3, 2023, grand jury subpoena. The events speak for themselves. They suggest that the government had a theory of the case prior to contacting Next Jump for the first time in early October 2023, and then viewed everything through a distorted lens without regard subsequently

to anything offered, produced, or what any other witness said that was inconsistent its theory. Moreover, from the fall of 2023 through May 2024, Next Jump pleaded repeatedly to meet and confer regarding the scope of the October 3 subpoena, particularly given that the government had seized hundreds of thousands of pages from email accounts of Mr. Kim and Ms. Messenger over a more than two-year period and seized their mobile phones.  But the government declined to speak about the subpoena until May 28, 2024, during which the government modified the subpoena.  Then, in what appears to have been a rush to judgment, the government indicted Mr. Kim and Ms. Messenger two days later.  Throughout this period, the government rejected Next Jump's repeated requests to meet with the government, present evidence in a presentation, or meet with supervisors of the U.S. Department of Justice in charge of the matter.

On or about January 5, 2023, the government obtained a 2703(d) Order for the Microsoft email accounts of Mr. Kim and Ms. Messenger at Next Jump from September 20, 2020, through January 5, 2023.  We understand that this resulted in production of over 416,000 pages.

On or about February 8, 2023, the government obtained search warrants for the Microsoft email accounts of Mr. Kim and Ms. Messenger at Next Jump from September 2020 through February 8, 2023.  We understand these returns generated over 217,000 pages of emails.

On October 3, 2023, federal agents went to the homes of Mr. Kim and Ms. Messenger, very early in the morning to question them in front of their families.  But Mr. Kim and Ms. Messenger were out of town to give a publicly announced keynote speech at Harvard University. The visit frightened their spouses and respective children.  That same morning, the government sent teams of federal agents to interview Next Jump employees, all of whom spoke with agents.

On or about October 3, 2023, the government served Next Jump with a grand jury subpoena with requests that were (1) duplicative of the documents the government already

possessed through multiple search warrants, (2) indefinite and overly broad, and (3) financially onerous to a small business with less than 25 employees.

On or about October 5, 2023, the government told Next Jump's then-outside counsel that the government had more than enough evidence to charge Mr. Kim and Ms. Messenger with federal crimes, and did not need their mobile telephones and anything else to do so.

On or about October 20, 2023, the government told Next Jump's general outside corporate counsel that the government had all they needed and would proceed to indict both Mr. Kim and Ms. Messenger in December. In essence, the government said that Mr. Kim and Ms. Messenger were "targets" of the grand jury investigation. Unfortunately, the government did not have an open mind then about the potential charges, and that never changed.

Next Jump cooperated with the government in good faith and attempted to engage on narrowing the requests in the grand jury subpoena to, at a minimum, exclude documents that the government already received from search warrants.

On November 21, 2023, during an in-person two-hour meeting, Next Jump's counsel asked the government to go through the grand jury subpoena and come back to the company with the government's subpoena priorities, pleading with the government to take into account what had already been seized through search warrants. Although the government and Next Jump had discussed potentially using search terms weeks earlier, this in-person meeting superseded the earlier discussion as the government agreed to come back to Next Jump regarding subpoena priorities and take into account the search warrant returns. During that same meeting, Next Jump provided material, exculpatory evidence dismantling key pillars of the government's theory of culpability and offered to provide more evidence. This was the first of multiple times when Next Jump offered to provide more evidence.

3

On or about November 30, 2023, Next Jump made a production of documents.  Exhibit 1. Among other things, Next Jump stated:  "We appreciate that, in connection with the above-referenced subpoena (the 'Subpoena'), you informed us that you would come back to us with the thoughts that we raised regarding the expense and burden of responding to certain requests where the government has copies of email communications as a result of search warrants.  We look forward to further discussions with you on this topic. We also plan to make an additional production of responsive documents later this week."  *Id.*

On or about December 13, 2023, Next Jump made a second production.  Exhibit 2.  Next Jump made these productions in good faith while waiting for the government to fulfill its promise to come back to the Company to have a dialogue about what the government actually wanted in light of, among other things, the search warrants it had executed.

In that December 13 letter, which the government never disputed or contradicted, Next Jump invited the government to speak with Next Jump investors, former employees, and current employees:  "We thank you for your time on Monday and appreciate that you will take into account our request to help facilitate interviews with NextJump shareholders and current/former employees in the future.  We understand that [Shareholder's] potential meeting later this week in Italy with a U.S. Department of Defense agent (Trey DeLaPena) apparently stationed in Germany is postponed in light of our representation of [Shareholder], and that you will come back to us for purposes of scheduling an interview with him so we can facilitate that and represent him. NextJump is fully cooperating with your investigation and will encourage all people to speak with you.  We believe strongly that your interviews of other people will demonstrate the good faith of NextJump, including Charlie Kim and Meghan Messenger, in communications with Admiral Robert Burke, and that Burke—with the apparent assistance of

others at Burke's direction and/or under his supervision—repeatedly deceived and misled NextJump.  As we have conveyed when we met on November 21 and yesterday, while the government has the right to approach people to ask questions without our knowledge, the agents' statements and approaches to date have frightened multiple people and caused unnecessary and unfortunate alarm about the manner in which they were treated.  We can help prevent that and facilitate interviews if you let us know which shareholders and NextJump employees you want to speak with about this matter.  Having people cooperate with the government's investigation is in the strong interests of NextJump." *Id*.

On or about December 13, 2023, Next Jump expressed concerns about Special Agent DeLaPena's communications in Europe with a Next Jump shareholder.  Exhibit 2.  We explained our concerns as follows:  "The more I think about it, the more I find it truly odd and concerning that Agent DeLaPena told [Shareholder] to communicate through texts and WhatsApp instead of through email, that the Agent did not answer the telephone number given with his name or where he worked when called by [Shareholder], that the Agent told [Shareholder] initially that they could meet at a U.S. consulate in Italy to make sure that [Shareholder] felt safe and secure but later changed the meeting place to a hotel lobby after the date was scheduled, etc.  We are confident that the U.S. Department of Justice would not have counseled agents to communicate via off-channel methods for document preservation and other reasons, or otherwise alarmed a witness."

On or about December 26, 2023, the day after Christmas, the government emailed Next Jump asking if Mr. Kim and Ms. Messenger would accept service of process of "Subject Letters" by email.  Exhibit 3.  The timing was odd.  There was no urgency.  And the timing and message raised questions about what the government was trying to accomplish on the day after Christmas.

The government stated in relevant part:  "You have informed us that you are only representing Next Jump and that you are not representing Messenger and Kim in their personal capacity.  However, we have two 'Subject Letters' and were hoping you would agree to accept service on their behalf.  Please let us know if you will do so or if the agents should serve them directly.  We appreciate your assistance and cooperation."  *Id*.  The next day Next Jump agreed to obtain consent from Mr. Kim and Ms. Messenger.  *Id.*  On December 29, 2023, Next Jump stated that "I was able to connect with Charlie and Meghan, and they authorized me to accept service of the letters, and I sent the letters to them."  *Id.*  The government certainly knew by then that Mr. Kim and Ms. Messenger would accept service through Next Jump and by email.

On or about January 20, 2024, the government emailed Next Jump that the government had not found any "suitable" way to narrow the grand jury subpoena requests.  Exhibit 4.

On January 22 and 25, 2024, Next Jump requested to speak with supervisors to discuss the matter, including the government's refusal to meet and confer with Next Jump regarding the subpoena and Next Jump's request to make a second presentation.  Exhibit 5.

On February 2, 2024, the government informed us that supervisors declined to meet with Next Jump's counsel.  Exhibit 5.

On February 9, 2024, Next Jump wrote to the government offering to provide substantial cooperation relating to the matter, and listed out contemporaneous evidence of the innocence of its co-CEOs.  Moreover, with respect to the subpoena, Next Jump wrote in relevant part:  "With respect to the NextJump subpoena, I am very surprised by your written response.  You promised that we would have a discussion about the requests, and we haven't had that discussion.  On at least two occasions since November 21, you and I spoke Trevor, and on each occasion you said you would get back to us about discussing the scope of the subpoena.  We put this in writing.

We've been waiting patiently.  The requests as written would call for the production of thousands and thousands of documents which the government already possesses through search warrants and phone seizures. I've made this point before, and have been waiting for a response. I would ask you to have a discussion with us about the requests and what you're looking for as you had promised, before you make any decision declining our request to talk about exactly what you're looking for with respect to the grand jury subpoena requests.  I don't understand why you would reject even having a discussion.   That's never happened to me before with the government, and I've been doing this for nearly 25 years on both sides.  There are many reasons why we would think that you would not only speak with us about the matter and scope, but also come to the reasonable conclusion that the government can be more surgical with NextJump in seeking documents."  Exhibit 5.

On or about February 12, 2024, the government stated that "I think we are seeing things differently."   Exhibit 6.   While the government stated Next Jump could bring additional documents to their attention, the government refused to meet with or speak with Next Jump.

Thus, as reflected in the written communications, Next Jump's counsel in person, by phone, and by email repeatedly stated that there was a significant financial burden to review hundreds of thousands of documents to identify responsive communications that the government already possessed after executing search warrants.  *See*, *e.g.*, Exhibit 7.  And notably, the government also had possession of Next Jump's financial statements and its bank records, meaning that the government certainly knew the financial burden was real.  The government had possession of the entirety of Next Jump's co-CEOs' email accounts for an over two-year period and their cellular phones.  And Next Jump's counsel repeatedly told the government that all responsive documents should be contained in the materials obtained through these search

warrants, given that Next Jump conducts the entirety of its business via email.   Exhibit 8.
Nevertheless, even though the United States government has taken the opposite position in other
cases that the undersigned counsel has handled, the government persisted in imposing an
existential, financial threat by asking Next Jump to collect and review hundreds of thousands of
communications that the government already possessed.

On March 6, 2024, the government asked for a status on Next Jump's production,
disregarding the requests for a meet and confer about the subpoena.   Exhibit 9.   On or about
March 11, 2024, a second grand jury subpoena was issued for the testimony of Next Jump's
records custodian.   Exhibits 10 and 11.   Next Jump accepted service by email.   Notably, the
government later withdrew this request and never requested or sought testimony from a
custodian of records.

Despite months of requesting that the government meet with Mr. Kim and
Ms. Messenger to speak with them directly about what the case was about and share whatever
information the government felt comfortable sharing with them directly—as Mr. Kim and
Ms. Messenger wanted to hear directly from the government about any of its concerns—the
government, after months of delay, abruptly refused to share any information with them and /or
explain to them directly why it was in their interest to answer questions.   And despite indicating
formally through a letter on December 26, 2023, during the year-end holidays, that Mr. Kim and
Ms. Messenger were "subjects", the government continued to push for Mr. Kim and
Ms. Messenger to answer questions without sharing any information with them, while refusing
on several occasions to meet with and hear any further information from Next Jump's counsel.

On or about March 11, 2024, the government stated by email that "we expect to provide
you with a list of Next Jump employees that we would like to schedule voluntary interviews with

before the end of the month." Exhibit 10. But the government never came back to request a single interview of any of Next Jump's current personnel, former personnel, or investors.

On or about March 28, 2024, Mr. Kim wrote to the government and their supervisors to point out key mistakes in the government's assumptions, and asking the supervisors to meet with Next Jump's counsel. Exhibit 12. The government disregarded the request.

On or about April 8, 2024, Next Jump produced over 96,000 pages of documents, including tens of thousands of pages of emails, credit card statements, and bank statements. Exhibit 7. Next Jump and the government disagree about this letter. Next Jump did not represent that it produced all responsive documents; Next Jump stated expressly in the letter that "this production *should* contain the remaining documents responsive to the government Subpoena *that may not already be in the government's possession* in light of the search warrant executed on the cloud of Next Jump's electronic storage, and within the phones of Meghan Messenger and Charlie Kim, both of which phones are in the government's possession." *Id*. The government mistakenly reads "executed on the cloud of Next Jump's electronic storage" as something more than what it says: that Next Jump understood the government obtained a search warrant from Microsoft for Next Jump's electronic data stored in the cloud. Next Jump also explained that it was relying on the fact that the government had seized all of Mr. Kim's and Ms. Messenger's emails, as well as their mobile phones, listing out what would be included in those collections. *Id*. But what cannot be in dispute is that Next Jump repeated its request to meet and confer: "We also have repeatedly asked during and since November 2023 that we discuss the Subpoena in person and/or by phone, because we wanted to confirm that the government has the responsive information in its possession to most of the requests, that some of the requests are vague and ambiguous, and that we had additional evidence which you did not seek in the

Subpoena.  The U.S. Department of Justice has repeatedly by phone and by email refused to engage in any dialogue with us.  That is also quite disappointing, and not in the best traditions of the U.S. Department of Justice nor in the actual interests of fairness and justice." *Id*.  Because the government refused to meet and confer regarding the subpoena (until May 28, 2024), the government never said what they had captured or did not capture in search warrants, and what they were looking for or needed.  That was not reasonable, and the government should not make allegations of failing to produce documents in the face of its continuous refusal to meet and confer about the subpoena.

On or about April 8, 2024, federal agents went to the homes of Mr. Kim and Ms. Messenger again.  This time they delivered grand jury subpoenas for documents to each of them in person.  The subpoenas requested Next Jump records, and was similar to the October 3 subpoena.  It was baffling.  The government never asked to accept service of process by email before going to their homes.  The government surely knew from Mr. Kim's and Ms. Messenger's acceptance on December 26, 2023, that they would of course accept service of process of the subpoenas by email.  Serving subpoenas at their homes made no sense.  And it brought back unfortunate memories for Mr. Kim, Ms. Messenger, and their families of federal agents visiting their homes in October 2023.  There was no need for the government to frighten the families of Mr. Kim and Ms. Messenger (again) by showing up to serve subpoenas.  And this is also putting aside the indisputable fact that the subpoenas called for company records.  Both Mr. Kim and Ms. Messenger emailed the government that they had received the subpoenas and directed the government to Next Jump for company records.  Exhibits 13 and 14.

From April 30 to May 21, 2024, Next Jump and the government exchanged emails regarding documents and a meet and confer discussion about the subpoena.  The government had

misread Next Jump's communications, disregarded that Next Jump pleaded to engage in a meet and confer discussion about the subpoena for months, and finally agreed to schedule a telephonic discussion about the subpoena.  Exhibit 15.  Mr. Kim also wrote directly to the government. Exhibit 16.

On or about May 28, 2024, the government met and conferred with Next Jump's counsel for the first time about the grand jury subpoena, despite multiple prior requests.  During this discussion, the government withdrew its request that Next Jump produce documents the government had already obtained through search warrants.  The government asked Next Jump to search for specific documents for the first time.  Specifically, the government speculated that there might be responsive documents in a shared file because Admiral Burke referenced an internal network relating to a publicly available training seminar.  This was the first time that the government asked us to search this share file.  Given what the undersigned knew about Next Jump's electronic communication methods, Next Jump did not expect any responsive documents to be there that was not circulated over email, but Next Jump agreed to look.  Moreover, Next Jump asked again for the opportunity to meet with supervisors before there is any charging decision made regarding Mr. Kim and Ms. Messenger.  The government declined.  Two days later, despite several follow-ups from the May 28, 2024, meet and confer discussion which had modified the October 3 subpoena, the government rushed to indict Mr. Kim and Ms. Messenger.

On May 31, 2024, despite knowing that Mr. Kim and Ms. Messenger had previously accepted service of "subject" letters and that they would accept service of subpoenas by email, the government sent federal agents to Mr. Kim's and Ms. Messenger's homes for a third time and arrested them in front of their children.  There was no excuse for that, especially given that the government allowed Admiral Burke to self-surrender.  The government surely knew that Mr.

Kim and Ms. Messenger would also self-surrender if given that opportunity.  Just hours later, the government told Next Jump, and their court-appointed counsel, that both Mr. Kim and Ms. Messenger could be released on their own recognizance without any bond.  Although agreeing to ROR meant that the government recognized neither were flight risks or presented any danger, the government sent federal agents to arrest Mr. Kim and Ms. Messenger at their homes.  There was no need for that, and it raised serious questions.

On August 2, 2024, the government issued a trial subpoena to Next Jump seeking to obtain documents.  The government assumed that Next Jump would accept service of process by email, and Next Jump did not raise an issue about the lack of service.

On or about August 6, 2024, the government offered to modify a single trial subpoena request: "We can revise Trial Subpoena Request 5 as follows: All records and communications, both internal and external, regarding business with or efforts to obtain business from the United States Navy or the UK Royal Navy."  But the government left the remaining requests unchanged.

On or about August 28, 2024, Next Jump filed its motion to quash the trial subpoena.  The government does not dispute this motion was timely made before the return date.  Instead, the government unfairly ascribes a venal motive to the timing, *see* Gov't 9/20/2024 Mot. at 8 n.5, without considering that the undersigned's schedule in August, including travel and the return dates of his three children from two different summer sleepaway camps, drove the timing, not any person at Next Jump, Mr. Kim, or Ms. Messenger.

With the factual record now corrected, Next Jump will address the unavailing arguments in the government's opposition to Next Jump's motion to quash.

## II.    THE GOVERNMENT'S TRIAL SUBPOENA MUST BE QUASHED BECAUSE IT VIOLATES THE *NIXON* STANDARD

The Supreme Court and this Circuit have applied Rule 17(c) narrowly.  "It was not intended to provide an additional means of discovery."  *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951); *see also United States v. Nixon*, 418 U.S. 683, 698–699 (same).  Rule 17(c) "is not a discovery device."  *United States v. Haldeman*, 559 F.2d 31, 75 (D.C. Cir. 1976). A party seeking the production of documents "'must clear three hurdles: (1) relevancy; (2) admissibility; [and] (3) specificity.'"  *United States v. Fitzsimons*, 342 F.R.D. 18, 20 (D.D.C. 2022) (citing *Nixon*).  The government fails to carry its burden for each requirement.

### A.    The Subpoenaed Documents Are Not All "Relevant" Under *Nixon*

The requesting party must show that there is a "reasonable likelihood" that the documents it seeks contain relevant evidence.  *Fitzsimons*, 342 F.R.D. at 21.  The subpoena must be quashed if it demonstrates only a "*mere expectation about what could be recovered without a showing of a sufficient likelihood* that the documents actually contained relevant evidence."  *Id.* (emphasis added).

The government overlooks this legal standard.  The government claims that each of its requests "is probative of an allegation in the Indictment," Gov't [date] Mot. at 11, but that is not the *Nixon* test.  Moreover, it becomes apparent when reviewing the requests.  For example, Request 1 seeks "Outlook calendars" for Mr. Kim and Ms. Messenger from September 1, 2019 through February 28, 2023, without reference to alleged events on specific dates in connection with the charges.  This request calls for the production of anything and everything regardless of whether it relates to Mr. Kim's and Ms. Messenger's family dinners or personal events, to business entirely unrelated to the U.S. Navy.  A proper request would target specific dates and specify events that have to do with the allegations.  Moreover, the government has already seized

13

the phones of Mr. Kim and Ms. Messenger, and has not explained why the information on those phones including their calendars cannot be accessed or reviewed.

Anticipating that Request 1 is a problem, the government offers an alternative of producing the Outlook calendar with subject matter categories. While Next Jump appreciates this concession, the new request still fails for lack of relevance under the *Nixon* standard. For instance, category (f), which asks for "any plans or offers for additional training or business opportunities with the United States Government following the January 2022 training" still would encompass documents that are irrelevant to the alleged charges, and constitute a fishing expedition.

The government's explanation of the relevance of Request 5 fails too. The government argues that it "narrowed Request 5 to only apply to efforts to obtain business from the U.S. Navy and U.K. Navy." Gov't 9/20/2024 Mot. at 13. And it then lists a string of allegations—as if repeating portions of the Indictment would somehow cure the breadth of this Request. These allegations are irrelevant. As Next Jump emphasized in its initial motion, requesting *all* internal communications regarding any "effort to obtain business from any branch of the United States Armed Forces" will encompass a large amount of material that is unrelated to the government's prosecution—no matter how much of the Indictment the government quotes—as clearly, for example, a hypothetical email exchange between two Next Jump employees about ambitions for a future hypothetical, innocuous military contract is clearly irrelevant to the government's prosecution and would fall within a fishing expedition.

Requests 7 and 8 are likewise extraordinarily broad because they do not sufficiently narrowly tailor the requested information. Request 7 demands, "[a]ll communications with any current or former member of the U.S. Armed Forces, Department of Defense, Office of

Personnel Management, or any foreign military service seeking to develop further business for Next Jump following its performance of the January 2022 contract acquired through bribery." Asking for *all* communications "seeking to develop further business for Next Jump" is the definition of fishing. Obviously Next Jump will continually seeking to develop business. And clearly not all of this business will be at all related to the charges in the Indictment. If the government seeks further information on motive, *see* Gov't 9/20/2024 Mot. at 14, then it should allege what specific follow-up contracts it believed the defendants acquired. Moreover, forcing Next Jump to produce documents in response to this Request would require admitting to a statement about acquiring contracts through bribery, which simply is not true. Request 8 is likewise overbroad as asking for "all records and communications to third parties discussing … the U.S. Navy" would clearly capture too much information. Would communications praising a U.S. Navy victory at sea be relevant? Would communications discussing the transfer of an aircraft carrier to the Eastern Mediterranean be relevant? Even discussions over potential business—when unrelated to the allegations in the indictment—would be irrelevant. The government makes no attempt to tailor these requests to its allegations.

The government has moved to quash trial subpoenas issued by defendants in other cases for similar reasons. For instance, in *United States v. Wecht*, the district court granted the government's motion to quash because the defendant was "attempting to use the Rule 17(c) subpoenas directed to custodians of records from various entities as a general discovery device to locate documents from third party entities *about* a witness that might possibly be useful for cross examination." *United States v. Wecht*, No. CRIM. 06-0026, 2008 WL 336298, at *1 (W.D. Pa. Feb. 4, 2008) (emphasis in original). The government should not be able to have it both ways. Here, the government seeks information that *might* be useful, casting a wide net because it

cannot specifically articulate the relevant material.  The government admits that it "cannot know exactly what the documents will show and the grounds for their potential admissibility at trial," Gov't 9/20/2024 Mot. at 16—a concession that proves the government has failed the *Nixon* test. Trial subpoenas are not discovery devices.  It is the government's job to demonstrate "a sufficient likelihood" of the relevance, and it obviously cannot do so when the argument it puts forth is that the material *might* be useful.

Requests 2, 3, 6, and 7 could be rewritten to seek specific relevant documents relating to a specific trip to Washington, D.C., specific visit(s) by Admiral Burke to Next Jump in New York City, and specific training in Italy and Spain in January 2022 for the U.S. Navy, but they do not meet the *Nixon* test as currently drafted.

In sum, the government has not demonstrated "a sufficient likelihood that the documents actually contain[] relevant evidence." *Fitzsimons*, 342 F.R.D. at 21.  "The test for enforcement is whether the subpoena constitutes a good faith effort to obtain identified evidence rather than a general 'fishing expedition' that attempts to use the rule as a discovery device." *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980).  The most plausible explanation for the breadth of the requests and the irrelevance is that the government has gone fishing to try to obtain whatever information it can find to use against defendants at trial.  The Court should quash the government's trial subpoena as written.

### B.    The Requested Documents Are Not All Admissible

In arguing that its Requests seek admissible documents under the Federal Rules of Evidence, the government asserts that, "[a]ll of the responsive documents are likely admissible at trial because they are either not hearsay under Federal Rule of Evidence 801(d)(2)—such as statements of a party opponent or coconspirator—or would fall within various hearsay

exceptions, including the business records exception under Federal Rule of Evidence 803(6)." Gov't 9/20/2024 Mot. at 15.

But this argument betrays the government's fishing expedition. The government has no specific idea as to the contents of the categories of documents it requests, and as a result does not even know what to ask for or what would ultimately be admissible. For example, the government speculates that documents responsive to its Request 1 would include "business meetings, calls and discussions as well as attendance lists, meeting invites, etc.," and that this would make the materials admissible under the business records exception of Federal Rule of Evidence 803(6). *Id*. However, this argument misses the point that this same request would also include a lot of other information that people store in their calendars, such as doctor appointments and kids' soccer games, that would not be admissible at trial.

The same issue would apply to the other requests: the requests do not *only* implicate documents that could be classified as business records. For example, under the business records hearsay exception, "making the record was a regular practice of that activity" is one of the requirements. Fed. R. Evi. 803(6)(C). But this would not necessarily apply to all documents that would be responsive to these requests.

The government repeatedly asserts that anything responsive would "*likely"* be admissible. But "likely" admissible does not meet the standard. The requesting party must show that there is a "reasonable likelihood" that the specific documents it seeks contain relevant evidence. *Fitzsimons*, 342 F.R.D. at 21. The government has not, and cannot, do so here because of how overly broadly it has written its requests. "A Rule 17(c) subpoena cannot be supported by a mere conjectural assertion as to what the requested material will show." *United States v. Kashmiri*, No. 09 CR 830-4, 2011 WL 1326373 (N.D. Ill. Apr. 1, 2011) (citing *United*

*States v. Segal*, 276 F.Supp.2d 896, 901 (N.D. Ill. 2003)).  In *Kashmiri*, the district court granted the government's motion to quash because the defendant's subpoena did not clear the relevancy and specificity hurdles.  *See id.* at *4–*5.  So too here.

### C.    The Requested Documents Are Not All Specific

Rule 17(c) subpoenas must meet the specificity requirement.    Courts will quash subpoenas for documents that request disclosures based on "broad categories of documents." *United States v. Libby*, 432 F. Supp. 2d 26, 32 (D.D.C. 2006).   If the moving party "cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused."  *Id.* (internal quotations and authority omitted).

The government asserts that its requests are "specific and detailed—calling for defined categories of documents related to specific dates, specific meetings, specific contracts, specific business efforts, and the employment of a specific individual."  Gov't 9/24/2024 Mot. at 16.  But just proclaiming the requests "specific and detailed" does not make them so.  Requests 2, 3, 4, 5, 6, and 8 request "all records and communications."   Request 1 plainly asks for *all* Calendar invites.   And Request 7 asks for "all communications."   By definition, these requests are not specific.  There is *no* limitation on events or topics.  "Subpoenas seeking 'any and all' materials, ***without mention of 'specific admissible evidence,***' justify the inference that the defense is engaging in the type of 'fishing expedition' prohibited by *Nixon*."  *United States v. Mendinueta-Ibarro*, 956 F. Supp. 2d 511, 513 (S.D.N.Y. 2013) (emphasis added) (citing *United States v. Louis*, No. 04 Cr. 203, 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005)).

Courts quash Rule 17 subpoenas featuring boilerplate references to "any and all" documents common in civil discovery requests found in the government's subpoena.[1]  All of these requests seek "to examine general categories of documents with the hope that they contain information that may be helpful to" its prosecution.  *Libby*, 432 F. Supp. 2d at 35.  "This is not the proper role Rule 17(c) subpoenas are intended to play in the criminal arena."  *Id.*

Thus, not only is the government's claim that "each request is tied to specific time periods and specific events and topics" inaccurate, it also misses the point.  The point is that the "events and topics" of the "any and all" requests are overbroad and capture information that is not specific and clearly irrelevant to the government's prosecution.

To remedy its mistake, the government attempts to change the scope of its request in its brief.  It asserts that, "Requests 5, 7, and 8 seeks documents specifically related to the use of the initial Navy contract to obtain larger contacts from, among others, the United States Navy and the U.K. Royal Navy, as alleged in the Indictment."  Gov't 9/24/2024 Mot. at 18.  But that is simply not what the text of the Requests state.  At the risk of belaboring the Court with

---

[1]    *United States v. Reyes*, 239 F.R.D. 591, 605-06 (C.D. Cal. 2006) (rejecting subpoena requests for all documents "relating" to the corporation's stock options grant programs or policies); *United States v. Ruedlinger*, 172 F.R.D. 453, 455, 457 (D. Kan. 1997) (rejecting subpoena requests for "any and all audit reports"); *United States v. Jackson*, 155 F.R.D. 664, 668 (D. Kan. 1994) (rejecting requests for "any and all documents," "all correspondence," and "all related records"); *United States v. Louis*, 2005 U.S. Dist. LEXIS 1087, No. 04-cr-203, 2005 WL 180885, at *5-6 (S.D.N.Y. Jan. 27, 2005) (quashing requests seeking "'any and all' documents relating to several categories of subject matter ... rather than specific evidentiary items"); *cf. Cheney v. United States Dist. Court*, 542 U.S. 367, 387 (2004) (contrasting *Nixon*'s criminal subpoenas, which "precisely identified" and "specific[ally] ... enumerated" relevant materials, with civil discovery requests that "ask for everything under the sky," and used "[a]ll documents" language); *Khouj v. Darui*, 248 F.R.D. 729, 732 n.6 (D.D.C. 2008) (describing subpoena as "grossly overbroad" when seeking "all documents relating to any account" held by subpoenaed party, without time limitation; particularly with phrases such as "including, but not limited to;" and "list[ed] categories of sought after documents that nearly always beg[an] with the word 'all.'").

repetition, Request 5 (as revised) asks for, "All records and communications, both internal and external, regarding business with or efforts to obtain business from the United States Navy or the U.K. Royal Navy." And in a footnote, the government argues that "Next Jump's efforts to obtain business from the U.S. Navy and U.K. Royal Navy [is] the focus of the charged criminal conspiracy." But again this misses the point. The request itself is broad and vague, leaving no clear meaning as to what *specific business* the government believes to have been potentially obtained as a result of the conspiracy. A proper, narrower request would at the very least identify the documents relating to the *exact* business sought.

And to be clear, Next Jump is not claiming "that the word 'all' compels quashing the subpoena," as the government mistakenly claims in its brief. Gov't 9/20/2024 Mot. at 18. But the word "all" plus categories of documents not limited by relevant topics does warrant quashing. Indeed, the "sweeping requests in [our] cases," *see* Gov't 9/24/2024 Mot. at 18, bear much resemblance to the government's sweeping subpoena.

The government tries its best to distinguish *Reyes* from the facts of the instant case. But its only real argument is that the company in *Reyes* was bigger, and the subpoena there used a "scattershot" approach. This numbers game that the government plays is unavailing: the words of the trial subpoena are either *per se* insufficiently specific, or they are not. In other words, the size of the company has no bearing on the text of the subpoena requests themselves. The requests are what they are. Whether a company is small or big does not change the fact that the subpoena requests here call for "all records and communications" for multiple subject matters over a two-and-a-half-year period. Indeed, the government subpoena "casts a wide net with the goal of reeling in something to support it." *United States v. Reyes,* 239 F.R.D. 591, 606 (N.D. Cal. 2006). Here, the government's net would capture hundreds of thousands of completely

irrelevant documents that have no bearing on the facts of this case. This is exactly the same "scattershot" approach that the *Reyes* court disallowed, and the Court should do the same here.

Next, the government attempts to distinguish the *Khouj* case cited in Next Jump's motion. Indeed, the government makes hay over the fact that the *Khouj* court noted that the subpoenas there sought "'all documents relating to *any* account' held by Khouj, *without time limitation*," whereas in the government's trial subpoena, there is a time limitation of two-and-a-half-years. *See* 9/20/24 Gov't Mot. At 19, citing *Khouj v. Darui*, 248 F.R.D. 729, 732 n.6 (D.D.C. 2008) (emphasis added by government). But the government should have kept reading. In the very same footnote, in the very next sentence, the *Khouj* court continues, "The subpoenas further contain phrases such as 'including, but not limited to' and list categories of sought after documents that nearly always begin with the word 'all.'" *Id*. Here, the government's trial subpoena also uses the phrase "including, but not limited to," and what's more, fully *seven* of the eight trial subpoena requests call for "all" records and/or communications, exactly like the subpoenas in *Khouj*. The *Kjouj* court recognized the overbreadth of the subpoenas in that case, and the Court should do the same here.

The government itself has moved to quash a trial subpoena from a defendant in similar circumstances, and the government again cannot have it both ways. In *United States v. Shelley*, the district court granted the government's motion to quash because the requests were overly broad and failed to satisfy the specificity requirement. *See United States v. Shelley*, No. CR-16-237-D, 2017 WL 3470940, at *3 (W.D. Okla. Aug. 11, 2017). "The subpoena broadly requests the FDIC-RMS to produce 'any and all documents,' 'all documents,' 'all reports,' 'every document,' and 'all suspicious activity reports' regarding its investigation over either a significant period of time or with no time restriction." *Id*.

## II.    THE GOVERNMENT CAN OBTAIN THE REQUESTED DOCUMENTS FROM THE UNITED STATES MILITARY

The government misstates Next Jump's argument here.  Next Jump did not and is not arguing that "they are only required to produce the documents if they are unavailable from another source."  Gov't 9/24/2024 Mot. at 20.  Likewise, the government's attempted distinction of *United States v. Poindexter* misses the mark.   The *Poindexter* court did *not* cabin the "otherwise procurable" requirement to a situation where "defendant requests the production pursuant to a subpoena of documents possessed both by a President or former President and also by some other entity."  Gov't 9/24/2024 Mot. at 20 n.9 (citing *United States v. Poindexter*, 727 F. Supp. 1501, 1509 (D.D.C. 1989).  The court *applied* the "otherwise procurable" requirement to the situation in *Poindexter* because of the Federal Rules of Criminal Procedure, which do not only apply to situations involving the President, as the government seems to believe: "That is so because as a general matter, Rule 17(c) requires a party seeking a subpoena to demonstrate that the materials 'are not otherwise procurable.'"   *Poindexter*, 727 F. Supp. at 1509 (citing other cases).  The government's citation to the rationale in *Nixon* for this rule, that it would expedite trial, misses the first reason the *Nixon* Court gave for the Rule 17(c) test it articulated: "the subpoena duces tecum in criminal cases: (1) [] was not intended to provide a means of discovery for criminal cases."  *Nixon*, 418 U.S. at 699.  Thus, when the Court articulated the test, it put the admissibility, relevance, and otherwise procurable elements all as requirements within the same test:

> Under this test, in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*Id.* at 699–700.

Thus, contrary to the government's reasoning, the "otherwise procurable" component, just like the admissibility, relevance, and specificity components, do in fact "determine whether a subpoenaed entity must produce records *at all*." Gov't [date] Mot. at 20 (emphasis in original). The *Poindexter* court plainly concluded, "insofar as President Reagan is concerned, ***he need not produce*** these answers because they are available from another source. Part (c) of the subpoena to former President Reagan is ***accordingly quashed as unnecessarily burdensome*.*" *Poindexter*, 727 F. Supp. at 1509 (emphasis added). The Ninth Circuit has articulated the same principle: "In order to justify a subpoena for production before trial, the proponent must also demonstrate that the subpoenaed materials are not available from any other source and their examination and processing should not await trial in the circumstances shown." *United States v. Eden*, 659 F.2d 1376, 1381 (9th Cir. 1981).

The Court should not let the government use Rule 17 "to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." *Nixon*, 418 U.S. at 698–99. To the extent the government believes Next Jump has some material evidence it believes exists for trial, it should identify that material with specificity, and then request the information in the first instance from the United States military, per the requirements of Rule 17.

The government next attempts to argue that its requested documents are not otherwise procurable reasonably in advance of trial. Granted, some of the requests would involve material that is only available to Next Jump. But some would not. Request 7, for example, demands, "[a]ll communications with any current or former member of the United States Armed Forces." Clearly the government should have access to the communications of the members of its military. The government argues that, "even with the exercise of due diligence the government

could not locate and obtain relevant communications between Next Jump employees and the United States Government." Gov't 9/24/2024 Mot. at 21. But the government is referring to records found in its own internal systems. The government can easily ask for searches of all communications with the Next Jump email domain. Requiring Next Jump to do the government's leg work is expensive and burdensome, and the Court should quash the government's subpoena as a result.

Instead of providing Next Jump with reasonable and legal subpoena requests, the government attempts to ascribe bad motives to distract from the legal deficiencies of its subpoena. The government argues that accepting Next Jump's argument "would unjustly reward Next Jump for their ongoing strategy to avoid and/or delay complying with valid legal process for as long as possible in order to benefit Kim and Messenger." Gov't 9/24/2024 Mot. at 22. This assumes bad motives where the record proves that it was the *government* who refused to engage in meet and confers with Next Jump regarding the scope of the subpoena, promised that it would be reasonable and then took back its promise, and then refused to speak with Next Jump and discuss the subpoena until two days before the indictment. Then the government rushed the indictment. That is a choice, and one the government must own.

As for the government's contention that "[i]f it were sufficient to excuse an entity from producing records in response to a subpoena because they may exist elsewhere, then every time multiple entities possessed responsive documents, one could quash a subpoena by pointing the finger to the other", Gov't 9/24/2024 Mot. at 22, this is not Next Jump's argument. Next Jump's point is that the very party seeking the documents—the government—has possession of its communications with Next Jump. Next Jump should not be forced to pay exorbitant costs to

pull, review, and produce what the government already has in its own possession from search warrants and its own servers.

This is particularly true when the government has refused to pay any costs to Next Jump for the identification, review, and production of any responsive documents.

The Supreme Court stated that, "the moving party must show ... that [the documents] are not otherwise procurable reasonably in advance of trial by exercise of due diligence." *Nixon*, 418 U.S. at 699. Instead of dealing with this legal requirement head on, the government posits an incorrect legal standard that Next Jump never articulated to show that it leads to an absurd result. *See* Gov't 9/24/2024 Mot. at 22. But the law is clear that the government must use "due diligence" to otherwise reasonably procure the documents.

## CONCLUSION

For the foregoing reasons, Next Jump respectfully requests that the Court grant Next Jump's Motion to Quash Trial Subpoena Under Rule 17(C)(2) Related to *United States of America v. Burke Et Al.* Next Jump respectfully requests oral argument (preferably in person) on this Motion to Quash.


Date: September 27, 2024                        /s/ Reed Brodsky
                                                _____
                                                Reed Brodsky (*pro hac vice*)
                                                GIBSON, DUNN & CRUTCHER LLP
                                                200 Park Avenue
                                                New York, New York 10166
                                                rbrodsky@gibsondunn.com

                                                John Matthew Butler (DC Bar No.: 1721350)
                                                GIBSON, DUNN & CRUTCHER LLP
                                                1050 Connecticut Ave., N.W.
                                                Washington, DC 20036
                                                mbutler@gibsondunn.com

                                                *Attorneys for Next Jump*